# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Loftness Specialized Farm
Equipment Inc.,

                  Plaintiff,

v.

Terry Twiestmeyer, Steven
Hood, and Twiestmeyer &
Associates, Inc.,

                  Defendants.

Civil No. 11-1506 (DWF/TNL)

**MEMORANDUM
OPINION AND ORDER**

---

Benjamin J. Rolf, Esq., and Karna A. Berg, Esq., Nilan Johnson Lewis PA, counsel for
Plaintiff.

Lawrence R. King, Esq., and Sarah E. Madsen, Esq., Larson King, LLP; Victoria H.
Buter, Esq., and Thomas H. Dahlk, Esq., Husch Blackwell LLP, counsel for Defendants.

---

## INTRODUCTION

This matter is before the Court on a Motion to Dismiss Counterclaims Under Rule

12(b)(6) brought by Plaintiff Loftness Specialized Farm Equipment Inc. ("Loftness").

(Doc. No. 15.)  For the reasons set forth below, the Court grants in part and denies in part

the motion.

## BACKGROUND

Loftness is in the business of manufacturing and selling farm machine

attachments.  (Doc. No. 1, Compl. ¶ 1.)  Defendant Terry Twiestmeyer owns

Twiestmeyer & Associates, Inc. ("T&A, Inc."), which is in the business of marketing and selling grain bagging equipment.  (Doc. No. 13, Answer and Countercl., Answer ¶¶ 2, 4.)[1]  T&A, Inc.'s business includes selling and marketing grain bagging equipment on behalf of Loftness.  (*Id.*)  Defendant Steven Hood, via his company Hood & Company, Inc., is a sales representative for Loftness.  (Answer ¶ 3.)

On May 15, 2007, Defendants Twiestmeyer and Hood met with representatives of Loftness to discuss Twiestmeyer's and Hood's idea for a "grain bagging" product line to sell in the United States (the "Grain Bag Storage System").  (Compl. ¶ 7; Countercl. ¶¶ 8, 10.)  At the meeting, Loftness and T&A, Inc. executed a Nondisclosure Agreement.[2]  (Compl. ¶ 8, Ex. A; Countercl. ¶¶ 9, 10.)  Under the terms of the Nondisclosure Agreement, Loftness agreed that "it will keep in confidence all Confidential Information, and that it will not directly or indirectly disclose to any third party or use for its own benefit, or use for any purpose other than the Project, any Confidential Information it receives from [T&A, Inc.]."  (Compl. ¶ 8, Ex. A, Agreement at ¶ 2.)  The Nondisclosure Agreement also provided that it "shall apply to any and all discussions, memoranda, and any other communications or representations outlined in the definition of 'Confidential Information' herein, taking place from the effective date of

---

[1]     The paragraphs in the Answer and Counterclaim are numbered separately. Therefore, the Court will cite to the Answer and Counterclaim separately.

[2]     Twiestmeyer prepared the Nondisclosure Agreement.  (Countercl. ¶ 9.)

this Agreement, and shall remain binding for twenty (20) years following the effective

date." (*Id*. ¶ 8.)  The Nondisclosure Agreement defined the following terms:

> 1.   Confidential Information.  Such information that [T&A, Inc.]
> considers to be proprietary and/or confidential, which may include, but is
> not limited to, prototypes, representative or demonstrative objects, trade
> secrets, discoveries, ideas, know-how, techniques, designs, specifications,
> drawings, data, computer programs, business activities and operations,
> reports, memoranda, studies, and other technical or business information.

> . . . .

> 3.   Project.  Any matter being developed, discussed, worked on,
> shared or contracted for between the parties to this Agreement.

(Compl. ¶ 8, Ex. A, Definitions at ¶¶ 1, 3.)

Defendants allege that at the May 2007 meeting, Twiestmeyer and Hood shared

Confidential Information when they discussed their ideas on how to develop the Grain

Bag Storage System.  (Countercl. ¶¶ 17-21.)  Defendants further allege that Loftness had

no experience manufacturing or marketing grain handling equipment and that

Twiestmeyer and Hood presented their past experiences and ideas on how to succeed in

developing the Grain Bag Storage System.  (*Id*.)  Specifically, Defendants contend that

Twiestmeyer and Hood disclosed the components of the Grain Bag Storage System,

along with the fact that the system needed "to have a clutch that would disengage the

cross augers while emptying the end of the bag, and that the grain bag unloader also

needed a clutch to disengage the roll-up drum for faster and safer operation."  (*Id*.

¶¶ 18-19.)  Twiestmeyer compared the concept for the system with existing equipment in

Argentina and explained the problems with the Argentinian products.  (*Id*.)  Twiestmeyer

and Hood also explained how their system would fit within the marketplace in the United States and made additional recommendations.  (*Id.* ¶¶ 20-21.)

On July 9, 2007, Loftness representatives traveled to T&A, Inc.'s warehouse "to look at a grain bagger and unloader manufactured by a foreign manufacturer that T&A, Inc. had in inventory."  (*Id.* ¶ 22.)  During this visit, Twiestmeyer and Hood explained in greater detail the functions of the grain bagger and unloader and discussed improvements that could be made to the system.  (*Id.*)  After the July 2007 meeting, Loftness arranged to transport the foreign-manufactured grain bagger and unloader to its facilities.  (*Id.* ¶ 23.)  According to Defendants, Loftness indicated that it would develop engineering drawings incorporating the information disclosed to Loftness at the prior meetings with Twiestmeyer and Hood.  (*Id.*)  Bill Schafer, a Loftness engineer, prepared drawings of the "improved" grain bagger and unloader.  (*Id.* ¶ 33.)

On September 15, 2007, Twiestmeyer and Hood applied for a United States Trademark for the term "Grain Bag™."  (*Id.* ¶ 24.)  Twiestmeyer and Hood also filed for a patent with the United States Patent and Trademark Office ("USPTO") on April 28, 2008.  (*Id.* ¶ 25.)[3]

---

[3]    The patent application was published on October 22, 2009.  (Compl. ¶ 10.)  In March 2010, Twiestmeyer and Hood filed an amendment with the USPTO adding Schafer as a co-inventor.  (*Id.* ¶ 11.)  The patent issued as United States Patent No. 7,997,849 B2 on August 16, 2011.  (Doc. No. 27, Rolf. Aff. ¶ 2 at Ex. 1.)  The '849 Patent describes a grain bag unloader for unloading grain from a bag that "includes a first clutch which is able to disengage the operation of the unloading auger while permitting the discharge auger to continue to operate.  The grain bag unloader also includes a second

(Footnote Continued on Next Page)

On January 1, 2008, Loftness and T&A, Inc. entered into a Sales Representative Agreement ("SRA").  (Compl. ¶ 14, Ex. B.)  Pursuant to the SRA, Loftness appointed T&A, Inc. to be Loftness' sales representative for certain products within a defined territory.  (*Id.*)  The SRA defined "Products" as "crop shredders, tree shredders, snowblowers, brush shredders, orchard shredders, flail mowers, skid steer attachments and other products as are listed from time to time in the Company Sales Manuals."  (*Id*. at Art. 1.1.)  The SRA also included the following provision:

> Entire Agreement: Counterparts.  This agreement constitutes the entire agreement of the parties with respect to the subject matter hereof, and terminates and supersedes all previous relationships and agreements by and between the Company and Representative, as well as all proposals, oral or written, and all previous negotiations, conversations or discussions between the parties related to this Agreement and to any other relationship of any kind between the parties. . . .

(*Id*. at Art. 7.6.)

On May 21, 2008, Loftness entered into an agreement with Twiestmeyer and Hood.[4]  Pursuant to the May 2008 Agreement, Twiestmeyer and Hood granted Loftness an exclusive license to the patent rights to the grain bag unloader and non-exclusive rights to the GrainBag™ trademark.  (Compl. ¶ 17, Ex. D at ¶¶ 1-2.)  "In addition to the terms of the said" patent and trademark licenses, Loftness agreed to pay Twiestmeyer and

---

(Footnote Continued From Previous Page)

clutch which is designed to disengage the bag winder tube."  (*Id*.)  Schafer has assigned his interest in the patent to Loftness.  (Compl. ¶ 11.)

[4]      The parties dispute whether the agreement was an "Override" or a "License" agreement.  The Court simply refers to the agreement as the "May 2008 Agreement."

Hood "a two percent (2%) override of the dealer net price on all grain bagging equipment and related products, except grain bags, sold by LOFTNESS during the term of the Agreement." (*Id.* ¶ 3.)  The May 2008 Agreement further provides that the "agreement is for a term of two (2) years commencing on the date of the last signature hereto." (*Id.* ¶ 5.)  Twiestmeyer and Hood reserved the right to terminate the May 2008 Agreement upon thirty days' notice if Loftness failed to either pay the 2% override or purchase all grain bags from Twiestmeyer and Hood.  (*Id.* ¶ 6.)  At the same time, Twiestmeyer and Hood entered into a Trademark License Agreement with Loftness that provided:

> The term of this Agreement shall begin on the effective date hereof and shall continue for so long as one or both Joint Owners remain subject to the terms of a subsisting distributorship agreement with LICENSEE.  Upon cancellation of such distributorship agreement, the parties may extend the License upon negotiation of mutually agreeable terms.

(Compl. ¶ 17, Ex. D at Ex. B § 5.)  Also on May 21, 2008, the parties executed an addendum to the SRA, wherein the parties changed the definition of "Products" in the SRA to include grain bag loaders and grain bag unloaders.  (Compl. ¶ 16, Ex. C at 1.)

Defendants allege that in May 2010, Loftness orally extended the term of the May 2008 Agreement.  (Countercl. ¶¶ 35, 36.)  Specifically, Defendants allege that:

> The [May 2008 Agreement] was orally extended on May 3, 2010, when Dave Nelson and Jerry Sechler telephoned both Twiestmeyer and Hood and in separate conversations advised them that Loftness has made an agreement with Brandt Industries, Inc. ("Brandt"), a Canadian corporation, to sell Brandt manufactures truck auger attachments in conjunction with Loftness manufactured grain bagging equipment, and stated that Brandy would sell Loftness-built grain baggers and grain bag unloaders for use with Brandt's truck auger attachment.

(Countercl. ¶ 35.)  Defendants further allege that:

> During the May 3, 2010 telephone conversations, Loftness expressly confirmed that with respect to any grain storage equipment sold to Brandt as well as all grain storage system equipment sold through Loftness' distribution channels [Twiestmeyer and Hood] would continue to receive the two percent (2%) override payments and expressly stated that the relationship with Brandt was a favorable development for [Twiestmeyer and Hood].

(*Id.* ¶ 36.)  Defendants also allege that Loftness continued to pay the two percent override until March 1, 2011.  (*Id.* ¶ 34.)

Sometime prior to December 2010, Loftness developed a new trademark, GrainLogix™, which it began to use instead of GrainBag™.  (Compl. ¶ 21.)  In January 2011, Loftness informed Twiestmeyer and Hood that it would no longer make payments under the May 2008 Agreement.  (Countercl. ¶¶ 37, 38; Compl. ¶ 23.)  On May 5, 2011, counsel for Defendants sent a letter to Loftness explaining that "Loftness has now advised [Twiestmeyer and Hood] that it does not plan to pay any more overrides to [Twiestmeyer and Hood] and intends to continue its contractual relationship with Brandt Industries in direct violation of the Nondisclosure Agreement and the May 21, 2008 Agreement that was modified on May 3, 2010."  (Compl. ¶ 24, Ex. E.)

Loftness then brought the present action, seeking a declaratory judgment that Loftness has no duty to pay any money to Defendants under any existing contract or other obligation.  Defendants filed an Answer and asserted Counterclaims for:  (1) breach of the May 2008 Agreement; (2) breach of the Nondisclosure Agreement; (3) violation of the Uniform Trade Secrets Act; (4) violation of the Uniform Deceptive Trade Practices Act; and (5) unjust enrichment and constructive trust.  Loftness now moves to dismiss Defendants' counterclaims.

## DISCUSSION

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged. *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). A court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint in deciding a motion to dismiss under Rule 12(b)(6). *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. As the United States Supreme Court recently reiterated, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under *Twombly*. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 555). In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Twombly*, 550 U.S. at 556.

## I.      Breach of May 2008 Agreement

In Count One of their Counterclaim, Defendants assert a claim for breach of the May 2008 Agreement.  Specifically, Defendants allege that Loftness orally extended the May 2008 Agreement, which required Loftness to make 2% override payments on grain bagging equipment, before the agreement's expiration in May 2010.  Specifically, Defendants allege that the May 2008 Agreement was orally extended via separate telephone conversations wherein Loftness represented that it had made an agreement with a Canadian corporation to sell truck auger attachments in conjunction with Loftness manufactured grain bagging equipment and expressly confirmed it would continue to pay the 2% override for any grain storage equipment sold to the Canadian company, as well as for grain storage system equipment sold through Loftness' distribution channels. (Countercl. ¶¶ 35, 36.)  Defendants also allege that Loftness continued to pay the two percent override until March 1, 2011.  (*Id*. ¶ 34.)

Loftness argues that Defendants fail to state a claim for breach of the May 2008 Agreement because the two-year agreement expired on May 21, 2010, and Loftness was not obligated to continue making payments under the agreement after that date.  Loftness further contends that it could terminate any alleged oral extension at will and that the statute of frauds makes any alleged oral modification to the May 2008 Agreement unenforceable.  In addition, Loftness asserts that no contract was made between the parties with respect to patent rights, that Loftness did not have a need for a patent license after May 21, 2010, and that it would have been unreasonable for Loftness to agree to continue to make payments after Loftness began using a different trademark.

Defendants have alleged that Loftness orally agreed to extend the agreement and continued to pay the override past the date on which Loftness asserts the agreement expired.  Accepting Defendants' allegations as true and taking all factual inferences in their favor, the Court concludes that Defendants' allegations are sufficient to sustain the claim that Loftness agreed to extend the terms of the May 2008 Agreement beyond May 2010.[5]  Thus, at this early stage in the litigation, the Court concludes that Defendants have sufficiently alleged a claim for breach of the May 2008 Agreement.

Loftness argues that it would have been unreasonable for it to agree to extend the May 2008 Agreement beyond the time that Loftness used Defendants' trademarks.  This argument, however, rests on the conclusion that the May 2008 Agreement was, in fact, a license agreement.  Defendants, however, point out that the express language of the May 2008 Agreement provides that the two percent override is "[i]n addition to the terms of the said licenses."  (Compl. ¶ 17, Ex. D. ¶ 3)  ("In addition to the terms of the said licenses relating to the Patent Rights and Trademark Rights, LOFTNESS agrees to pay T&H a two percent (2%) override of the dealer net price on all grain bagging equipment and related products, except grain bags, sold by LOFTNESS during the term of the

---

[5]      Loftness acknowledges that parties to an expiring contract may expressly agree to extend it or may by their conduct create a new, implied-in-fact contract.  (Doc. No. 26 at 14, *citing Webb Candy, Inc. v. Wal-Mart Stores, Inc*., Civ. No. 09-2056, 2010 WL 2301461, at *8 (D. Minn. June 7, 2010).)  The Court in *Webb Candy* explained the general principle that when parties continue to perform under an expired contract, their conduct can give rise to an implied-in-fact contract.  *Webb Candy*, 2010 WL 2301461, at *8.  The specific facts of the *Webb Candy* case are distinguishable from the facts of this case.

Agreement.").) Defendants have alleged sufficient facts to support its claim that Loftness' obligation to pay the 2% override was connected to its sale of the grain bagging equipment, and the fact that Loftness decided to use a different trademark to sell the equipment did not terminate its obligation to pay the override.

Loftness also argues that the statute of frauds makes any oral modification to the May 2008 Agreement unenforceable because Defendants have failed to state any term for the alleged extension. However, at this early stage of the litigation, it cannot be said that the extension could not have been performed within a year. In addition, Defendants have alleged facts to suggest that the twenty-year relationship outlined in the NDA could have provided a basis for the duration of the 2% override. With this time frame in mind, Defendants maintain that if Loftness wanted to cease paying the override, it had to cease both selling the Grain Bag Storage System and using the Confidential Information disclosed to Loftness under the NDA. Thus, at this early stage of the litigation, Loftness has not established that the statute of frauds bars the alleged oral modification to the May 2008 Agreement.

For the above reasons, the Court denies Loftness' motion to dismiss Count One of Defendants' Counterclaim.

## II.    Breach of the Nondisclosure Agreement

In Count Two of their Counterclaim, Defendants assert a claim for breach of the Nondisclosure Agreement. In particular, Defendants allege that Loftness breached the Nondisclosure Agreement by: (1) disclosing Confidential Information to a third party for purposes other than the Grain Bag Storage System developed by Loftness and

11

Twiestmeyer and Hood; (2) failing to return all Confidential Information to T&A, Inc.;

(3) using Confidential Information in competition to the business developed as part of the

Project; and (4) failing to protect the Confidential Information from being published or

disclosed to third parties.  (Countercl. ¶ 50.)

Loftness argues that Defendants have failed to state a claim for breach of the

Nondisclosure Agreement.  Specifically, Loftness argues that the SRA terminated and

superseded the Nondisclosure Agreement. Defendants argue that the Nondisclosure

Agreement was not superseded by the SRA because the subject matter of the

Nondisclosure Agreement —Confidential Information pertaining to the Grain Bag

Storage System—was not mentioned in the SRA.

Article 7.6 of the SRA provides:

> Entire Agreement: Counterparts.  This agreement constitutes the entire
> agreement of the parties with respect to the subject matter hereof, and
> terminates and supersedes all previous relationships and agreements by and
> between the Company and Representative, as well as all proposals, oral or
> written, and all previous negotiations, conversations or discussions between
> the parties related to this Agreement and to any other relationship of any
> kind between the parties. . . .

(Compl. ¶ 14, Ex. B at Art. 7.6.)  While the language of Article 7.6 is broad, the first

sentence indicates that the "agreement constitutes the entire agreement of the parties *with*

*respect to the subject matter hereof*."  (*Id*. (emphasis added).)  Thus, while the remaining

language of Article 7.6 broadly states that it supersedes "all previous relationships and

agreements by and between" Loftness and T&A, Inc., "related to this Agreement and to

any other relationship of any kind between the parties," it is not clear that the parties

intended that the SRA would supersede the Nondisclosure Agreement.  Moreover, there

is no dispute that the Nondisclosure Agreement specifically covers information pertaining to the Grain Bag Storage System that was initially discussed by the parties in May 2007. The SRA, however, which appointed T&A, Inc., to represent Loftness as a sales representative in a defined territory with respect to various products, *does not* cover any components of the Grain Bag Storage System.  Considering that the SRA and Nondisclosure Agreement relate to different subject matters, and while accepting Defendants' allegations as true and taking all factual inferences in Defendants' favor, the Court declines to rule that the SRA superseded the Nondisclosure Agreement as a matter of law.  Thus, the Court denies Plaintiff's motion to dismiss Defendants' counterclaim for breach of the Nondisclosure Agreement.

### III.    Misappropriation of Trade Secrets

In Count Three of their Counterclaim, Defendants assert a claim for misappropriation of trade secrets under Minn. Stat. § 325C.01-.08.  In Paragraphs 18-22 of the Counterclaim, Defendants describe Confidential Information shared with Loftness, such as the components of the new grain bag unloader and the "understanding of the market." (Countercl. ¶¶ 18-21.)  Defendants further allege that Loftness is using the Confidential Information disclosed to it and is now manufacturing and selling the very products that were created as a result of the disclosure of the Confidential Information.

Loftness asserts that Defendants' counterclaim for misappropriation of trade secrets should be dismissed because Defendants fail to specify any information that constitutes a trade secret, let alone any facts to support the remaining elements of a trade secret misappropriation claim.

Minnesota's Trade Secrets Act requires the party seeking protection to show both the existence and the misappropriation of a trade secret. *Electro-Craft Corp. v. Controlled Motion, Inc*., 332 N.W.2d 890, 897 (Minn. 1983) ("Without a proven trade secret there can be no action for misappropriation even if defendants' actions were wrongful."). To sufficiently allege the existence of a "trade secret" under the Act, Defendants must allege facts that could prove that (1) the information was not generally known or readily ascertainable; (2) the information derived independent economic value from secrecy; and (3) Defendants made reasonable efforts to maintain the information's secrecy. *See, e.g., NewLeaf Designs, LLC v. BestBins Corp.,* 168 F. Supp. 2d 1039, 1043 (D. Minn. 2001).

While recognizing that Defendants have alleged the disclosure of Confidential Information, Defendants have not identified any particular trade secrets with sufficient specificity. Defendants' generalized allegations with respect to their alleged trade secret information do not afford the necessary detail by which to test whether any of the information constitutes a trade secret. Therefore, the Court grants Loftness' motion to dismiss with respect to this claim and dismisses Defendants' trade secret claim without prejudice. If, in the future, Defendants are able to provide a list of their alleged trade secrets with sufficient specificity, Defendants can move for leave to amend.

## IV.    Minnesota Deceptive Trade Practices Act

In Count Four of their Counterclaim, Defendants assert a violation of the Minnesota Deceptive Trade Practices Act. Defendants have agreed to voluntarily dismiss

this claim without prejudice.  (Doc. No. 29 at 24.)  Thus, this claim is dismissed without prejudice.

## V.     Unjust Enrichment and Constructive Trust

In Count Five of their Counterclaim, Defendants assert claims for unjust enrichment and constructive trust.  Here, the parties' relationships are governed by various contracts.  Accordingly, Defendants are not entitled to plead equitable claims in the alternative.  *See, e.g., European Roasterie, Inc. v. Dale*, Civ. No. 10–53, 2010 WL 1782239, at *5 (D. Minn. May 4, 2010).  Thus, Defendants' equitable counterclaims are properly dismissed.  Accordingly, Count Five of Defendants' Counterclaim is dismissed without prejudice.

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that Plaintiff's Motion to Dismiss Counterclaims Under Rule 12(b)(6) (Doc. No. [15]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

1.     To the extent Plaintiff seeks dismissal of Counts Three, Four, and Five, the motion is **GRANTED**, and Counts Three, Four, Five of Defendants' Counterclaim (Doc. No. [13]) are **DISMISSED WITHOUT PREJUDICE**.

2.     To the extent Plaintiff seeks dismissal of Counts One and Two of Defendants' Counterclaim (Doc. No. [13]), the motion is **DENIED**.


Dated:  April 13, 2012             s/Donovan W. Frank
                                    DONOVAN W. FRANK
                                    United States District Judge