**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Loftness Specialized Farm Equipment, Inc., | Civil No. 11-1506 (DWF/TNL) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Terry Twiestmeyer, Steven Hood, and Twiestmeyer & Associates, Inc., | |
| Defendants. | |

Benjamin J. Rolf, Esq., and Karna A. Berg, Esq., Nilan Johnson Lewis PA, counsel for Plaintiff.

Lawrence R. King, Esq., and Sarah E. Madsen, Esq., Larson King, LLP; Victoria H. Buter, Esq., and Thomas H. Dahlk, Esq., Husch Blackwell LLP, counsel for Defendants.

**INTRODUCTION**

This matter is before the Court on Plaintiff Loftness Specialized Farm Equipment, Inc.'s ("Loftness") Motion for Summary Judgment on Defendants' two remaining counterclaims. (Doc. No. 40.) For the reasons set forth below, the Court grants the motion.

## BACKGROUND[1]

Loftness is in the business of manufacturing and selling farm machine attachments.  (Doc. No. 1, Compl. ¶ 1.)  Defendant Terry Twiestmeyer ("Twiestmeyer") owns Twiestmeyer & Associates, Inc. ("T&A, Inc."), which is in the business of marketing and selling grain bagging equipment.  (Doc. No. 13, Answer and Countercl., Answer ¶¶ 2, 4.)[2]  T&A, Inc.'s business includes selling and marketing grain bagging equipment on behalf of Loftness.  (*Id.*)  Defendant Steven Hood ("Hood"), via his company, Hood & Company, Inc., is a sales representative for Loftness.  (Answer ¶ 3.)

On May 15, 2007, Defendants Twiestmeyer and Hood (collectively, "Defendants") met with representatives of Loftness to discuss Defendants' idea for a "grain bagging" product line to sell in the United States (the "Grain Bag Storage System").  (Compl. ¶ 7; Countercl. ¶¶ 8, 10.)  At the meeting, Loftness and T&A, Inc. executed the Nondisclosure Agreement.[3]  (Compl. ¶ 8, Ex. A; Countercl. ¶¶ 9, 10.) Under the terms of the Nondisclosure Agreement, Loftness agreed to "keep in confidence all Confidential Information, and that it will not directly or indirectly disclose to any third party or use for its own benefit, or use for any purpose other than the Project, any Confidential Information it receives from [T&A, Inc.]."  (Compl. ¶ 8, Ex. A, Nondisclosure Agreement ¶ 2.)  The Nondisclosure Agreement also provided that it

---

[1]   The Court outlined the relevant facts in its April 13, 2012 Order and reiterates them here.  (Doc. No. 36, "April 2012 Order".)

[2]   The paragraphs in the Answer and Counterclaim are numbered separately. Therefore, the Court will cite to the Answer and Counterclaim separately.

[3]   The Nondisclosure Agreement was drafted on Twiestmeyer's behalf by his daughter, who is an attorney.  (Doc. No. 54, Berg. Aff. ¶ 2, Ex. 3 (TAI Dep.) at 21; Countercl. ¶ 9.)

"shall apply to any and all discussions, memoranda, and any other communications or representations outlined in the definition of 'Confidential Information' herein, taking place from the effective date of this Agreement, and shall remain binding for twenty (20) years following the effective date." (*Id.* ¶ 8.) The Nondisclosure Agreement defined the following terms:

> 1. <u>Confidential Information.</u> Such information that [T&A, Inc.] considers to be proprietary and/or confidential, which may include, but is not limited to, prototypes, representative or demonstrative objects, trade secrets, discoveries, ideas, know-how, techniques, designs, specifications, drawings, data, computer programs, business activities and operations, reports, memoranda, studies, and other technical or business information.
>
> . . . .
>
> 3. <u>Project.</u> Any matter being developed, discussed, worked on, shared or contracted for between the parties to this Agreement.

(Compl. ¶ 8, Ex. A, Definitions at ¶¶ 1, 3.)

Defendants allege that at the May 2007 meeting, Twiestmeyer and Hood shared Confidential Information when they discussed their ideas on how to develop the Grain Bag Storage System. (Countercl. ¶¶ 17–21.) Defendants further allege that Loftness had no experience manufacturing or marketing grain handling equipment and that Defendants presented their past experiences and ideas on how to succeed in developing the Grain Bag Storage System. (*Id.*; Doc. No. 57, Butler Aff. ¶ 4, Ex. A (Loftness Dep.) at 20–21.) Specifically, Defendants contend that they disclosed the components of the Grain Bag Storage System, along with the fact that the system needed "to have a clutch that would disengage the cross augers while emptying the end of the bag, and that the grain bag unloader also needed a clutch to disengage the roll-up drum for faster and safer

operation." (Countercl. ¶¶ 18–19; Loftness Dep. at 44–45.) Twiestmeyer compared the concept for the system with existing equipment in Argentina and explained the problems with the Argentinian products. (Countercl. ¶¶ 18–19; Loftness Dep. at 44.) Defendants also explained how their system would fit within the marketplace in the United States and discussed marketing strategies to produce grain bag unloaders that did not have the problems of similar products manufactured by competitors. (Countercl. ¶¶ 20–21; Loftness Dep. at 27, 48–49.)

On July 9, 2007, Loftness representatives traveled to T&A, Inc.'s warehouse "to look at a grain bagger and unloader manufactured by a foreign manufacturer that T&A, Inc. had in inventory." (Countercl. ¶ 22.) During this visit, Defendants explained in greater detail the functions of the grain bagger and unloader and discussed improvements that could be made to the system. (*Id*.) After the July 2007 meeting, Loftness arranged to transport the foreign-manufactured grain bagger and unloader to its facilities. (*Id*. ¶ 23.) According to Defendants, Loftness indicated that it would develop engineering drawings incorporating the information disclosed to Loftness at the prior meetings with Twiestmeyer and Hood. (*Id*.) Bill Schafer, a Loftness engineer, prepared drawings of the improved grain bagger and unloader. (*Id*. ¶ 33.)

On September 15, 2007, Twiestmeyer and Hood applied for a United States Trademark for the term "Grain Bag™." (*Id*. ¶ 24.) Twiestmeyer and Hood also filed for a patent with the United States Patent and Trademark Office ("USPTO") on April 28, 2008. (*Id*. ¶ 25.) The patent application was published on October 22, 2009. (Compl. ¶ 10.) In March 2010, Twiestmeyer and Hood filed an amendment with the

4

USPTO that added Schafer as a co-inventor. (*Id.* ¶ 11.) The patent issued as United States Patent No. 7,997,849 B2 ("the '849 Patent") on August 16, 2011. (Doc. No. 54, Berg Aff. ¶ 2, Ex. 8.) The '849 Patent describes a grain bag unloader for unloading grain from a bag that "includes a first clutch which is able to disengage the operation of the unloading auger while permitting the discharge auger to continue to operate. The grain bag unloader also includes a second clutch which is designed to disengage the bag winder tube." (*Id.*) Schafer has assigned his interest in the patent to Loftness. (Compl. ¶ 11.) Additionally, comprehensive owner's manuals containing detailed schematics and specifications for the Grain Bag Storage System Loftness manufactured were provided to buyers. (Doc. No. 54, Berg. Aff. ¶ 2, Exs. 11, 12.) In October 2007, Hood exchanged several e-mails containing some of the allegedly confidential grain bag improvement ideas with third parties without any apparent effort to mark their communications or ideas as confidential. (Doc. No. 54, Berg. Aff. ¶ 2, Exs. 9, 10.)

On January 1, 2008, Loftness and T&A, Inc. entered into a Sales Representative Agreement ("SRA"). (Compl. ¶ 14, Ex. B.) Pursuant to the SRA, Loftness appointed T&A, Inc. to be Loftness' sales representative for certain products within a defined territory. (*Id.*) The SRA defined "Products" as "crop shredders, tree shredders, snowblowers, brush shredders, orchard shredders, flail mowers, skid steer attachments and other products as are listed from time to time in the Company Sales Manuals." (*Id.* at Art. 1.1.) The SRA also included the following provision:

> <u>Entire Agreement: Counterparts</u>. This agreement constitutes the entire agreement of the parties with respect to the subject matter hereof, and terminates and supersedes all previous relationships and agreements by and

>between the Company and Representative, as well as all proposals, oral or written, and all previous negotiations, conversations or discussions between the parties related to this Agreement and to any other relationship of any kind between the parties. . . .

(*Id.* at Art. 7.6.)

On May 21, 2008, Loftness entered into an agreement with Twiestmeyer and Hood ("the May 2008 Agreement").[4] Pursuant to the May 2008 Agreement, Twiestmeyer and Hood granted Loftness an exclusive license to the patent rights to the grain bag unloader and non-exclusive rights to the GrainBag™ trademark. (Compl. ¶ 17, Ex. D at ¶¶ 1–2.) "In addition to the terms of the said" patent and trademark licenses, Loftness agreed to pay Twiestmeyer and Hood "a two percent (2%) override of the dealer net price on all grain bagging equipment and related products, except grain bags, sold by LOFTNESS during the term of the Agreement." (*Id.* ¶ 3.) The May 2008 Agreement further provided that the "agreement is for a term of two (2) years commencing on the date of the last signature hereto." (*Id.* ¶ 5.) Twiestmeyer and Hood reserved the right to terminate the May 2008 Agreement upon thirty days' notice if Loftness failed to either pay the two percent override or purchase all grain bags from Twiestmeyer and Hood. (*Id.* ¶ 6.) Also on May 21, 2008, the parties executed an addendum to the SRA, wherein the parties broadened the definition of "Products" in the SRA to include grain bag loaders and unloaders. (Compl. ¶ 16, Ex. C at 1.)

Loftness's Vice President, Richard David Nelson ("David Nelson"), did not recall why the May 2008 Agreement was limited to a two-year term. (Loftness Dep. at 7, 57.)

---

[4] Twiestmeyer drafted the May 2008 Agreement. (Doc. No. 53, Nelson Decl. ¶ 8.)

6

However, Twiestmeyer and Hood asserted that the Agreement's two-year duration was for Defendants' protection in the event that Loftness did not have the capability to turn Defendants' ideas into manufactured products. Specifically, Twiestmeyer stated:

> We set the [May 2008 Agreement] up on a 2-year term with – our counsel suggested a 2-year term for the reason that if Loftness did not carry through and produce machines and put them into the marketplace, that we would have the opportunity to take the idea and basically go someplace else with it.

(Doc. No. 54, Berg Aff. ¶ 2, Ex. 2 (Twiestmeyer Dep.) at 19–20.) Similarly, Hood testified as follows in response to a question as to what questions Loftness asked regarding the duration of the May 2008 Agreement:

> The response was that if they didn't perform, if they didn't build the equipment like it should be, if they just took the idea and sat on it and didn't go with it, that we would have the right to take the – the concept, the project, and go somewhere else to somebody who could do it. And it was always my understanding that the non-disclosure agreement with the 20-year term in it overrode this and that the term – two-year term in it overrode this term and that term – two-year term was in there to protect us more than them.

(Doc. No. 54, Berg Aff. ¶ 2, Ex. 1 (Hood Dep.) at 141.) Twiestmeyer repeatedly acknowledged that he knew that once the grain bag equipment improvements were incorporated into manufactured products, this information became public and that Loftness did not violate the Nondisclosure Agreement by manufacturing and selling the Grain Bag Storage System. (TAI Dep. at 92, 107, 111; Twiestmeyer Dep. at 107–08.)

On April 30, 2010, Loftness entered into an agreement with Brandt Agricultural Products Limited ("Brandt") wherein Brandt would sell the grain bag loaders and unloaders Loftness manufactured and Brandt would manufacture grain loading augers for

Loftness to sell. (Nelson Decl. ¶ 6.) When exchanging drawings for grain bag loaders and unloaders, Loftness informed Brandt that this information was considered proprietary and that the reciprocal manufacturing agreement between the two companies was marked as confidential. (Doc. No. 57, Butler Aff. ¶ 6, Ex. C (David Nelson Dep.) at 65, 104.)

Defendants contend that in May 2010, Loftness orally extended the term of the May 2008 Agreement. (Countercl. ¶¶ 35, 36.) Specifically, Defendants allege that:

> The [May 2008 Agreement] was orally extended on May 3, 2010, when Dave Nelson and Jerry Sechler telephoned both Twiestmeyer and Hood and in separate conversations advised them that Loftness had made an agreement with Brandt Industries, Inc. ("Brandt"), a Canadian corporation, to sell Brandt manufactured truck auger attachments in conjunction with Loftness manufactured grain bagging equipment, and stated that Brandt would sell Loftness-built grain baggers and grain bag unloaders for use with Brandt's truck auger attachment.

(Countercl. ¶ 35.) Defendants further allege that:

> During the May 3, 2010 telephone conversations, Loftness expressly confirmed that with respect to any grain storage equipment sold to Brandt as well as all grain storage system equipment sold through Loftness' distribution channels [Twiestmeyer and Hood] would continue to receive the two percent (2%) override payments and expressly stated that the relationship with Brandt was a favorable development for [Twiestmeyer and Hood].

(*Id.* ¶ 36.) Defendants also assert that Loftness continued to pay the two percent override until March 1, 2011. (*Id.* ¶ 34.) Hood testified that during the May 2010 conference call, David Nelson and Jerry Sechler informed him of Loftness's agreement with Brandt to cross-market and build grain bag storage equipment, asserted that the arrangement "would be a good deal for all of us," and reiterated that Defendants expected to continue to receive their two percent override payments. (Hood Dep. at 144–45.) Additionally,

8

David Nelson recalled that Twiestmeyer did not object to the agreement between Brandt and Loftness "[a]s long as it doesn't change our deal." (Loftness Dep. at 170–71.)[5]

Sometime prior to December 2010, Loftness developed a new trademark, GrainLogix™, which it began to use instead of GrainBag™. (Compl. ¶ 21.) In January 2011, Loftness informed Twiestmeyer and Hood that the May 2008 Agreement "expired on the 21st of [2010] and that we don't believe there is a need to pay you the 2 percent anymore."[6] (Loftness Dep. at 169; Countercl. ¶¶ 37, 38; Compl. ¶ 23.) On May 5, 2011, Defendants' counsel sent a letter to Loftness explaining that "Loftness has now advised [Twiestmeyer and Hood] that it does not plan to pay any more overrides to [Twiestmeyer and Hood] and intends to continue its contractual relationship with Brandt Industries in direct violation of the Nondisclosure Agreement and the May 21, 2008 Agreement that was modified on May 3, 2010." (Compl. ¶ 24, Ex. E.)

In their Response to Plaintiff's First Set of Interrogatories, Defendants identified seven trade secrets they divulged to Loftness in May 2007 and six trade secrets regarding additional Grain Bag Storage System improvements they shared with Loftness between 2007 and 2009. (Doc. No. 54, Berg Aff. ¶ 2, Ex. 7 at 3–4.) Defendants further asserted that the "Confidential Information" they disclosed to Loftness pursuant to the Nondisclosure Agreement was "broader than the 'Trade Secrets' and includes all

---

[5]   In January 2011, Defendants presented Loftness with a proposed agreement, which referred back to the Nondisclosure Agreement, that purported to memorialize the alleged oral extension of the May 2008 Agreement for an additional ten years. (Doc. No. 54, Berg Aff. ¶ 2, Ex. 16 at 3.) Loftness did not sign this agreement. (*Id*. at 4.)

[6]   David Nelson further testified that he did not recall verbatim was what said. (Loftness Dep. at 169.)

information relating to the Grain Bag Storage System." (*Id.* at 5.) They contended that "[b]efore the Confidential Information was disclosed on May 15, 2007 and thereafter, Loftness had no familiarity with grain bagging equipment or the relevant market. Discovery will reveal all relevant 'Confidential Information.'" (*Id.*) However, Defendants were unable to identify any specific confidential information that Loftness shared beyond the product improvement ideas and marketing information they brought to Loftness between 2007 and 2009, which were incorporated into publicly sold and marketed products. (TAI Dep. at 22–23, 93–94, 96–97, 135–36.)

Loftness brought the present action, seeking a declaratory judgment that Loftness has no duty to pay any money to Defendants under any existing contract or other obligation. Defendants filed an Answer and asserted Counterclaims for: (1) breach of the May 2008 Agreement; (2) breach of the Nondisclosure Agreement; (3) violation of the Uniform Trade Secrets Act ("UTSA"); (4) violation of the Uniform Deceptive Trade Practices Act ("UDTPA"); and (5) unjust enrichment and constructive trust.

In April 2012, the Court issued an Order on Loftness's motion to dismiss, dismissing Defendants' counterclaims for violation of the UTSA, violation of the UDTPA, and unjust enrichment and constructive trust. With respect to Defendants' Uniform Trade Secrets Act claim, the Court found that "Defendants have not identified any particular trade secrets with sufficient specificity. . . . If, in the future, Defendants are able to provide a list of their alleged trade secrets with sufficient specificity, Defendants can move for leave to amend." (*Id.* at 14.) Defendants have not moved to amend, nor have they filed an amended Answer and Counterclaims. The Court also

denied Loftness's motion without prejudice as to Defendants' counterclaims for breach of the May 2008 Agreement and the Nondisclosure Agreement. (*Id.* at 15.) Loftness now moves for summary judgment on Defendants' two remaining counterclaims, which are addressed below.

## DISCUSSION

### I.   Summary Judgment Standard

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts

showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.     Motion for Summary Judgment

In support of their contention that Loftness breached both the Nondisclosure Agreement and the May 2008 Agreement, Defendants assert that the merger clause contained in Article 7.6 of the SRA extended the term of the two percent payments set forth in the May 2008 Agreement to twenty years rather than the two years provided for in the contract. (Compl. ¶ 14, Ex. B.) Loftness, on the other hand, argues that the SRA terminated and replaced the Nondisclosure Agreement.[7] Loftness contends that the May 2008 Agreement ended in May 2010 and that it has never breached any of its agreements with Defendants.

A merger clause "establishes that the parties intended the writing to be an integration of their agreement." *Alpha Real Estate Co. v. Delta Dental Plan*, 664, N.W.2d 303, 312 (Minn. 2003); *see* Richard A. Lord, Williston on Contracts ¶ 33:21 (4th ed. 1999). "When interpreting a written instrument, 'the intent of the parties is determined from the plain language of the instrument itself.'" *Am. Nat. Bank of Minn. v. Hous. and Redevelopment Auth.*, 773 N.W.2d 333, 338 (Minn. Ct. App. 2009) (quoting *Travertine Corp. v. Lexington-Silverwood*, 683 N.W.2d 267, 271 (Minn. 2004)). If parties execute contracts simultaneously that relate to the same transaction, "they will be read together and each will be construed with reference with each other." *Anchor Cas.*

---

[7]     At oral argument, Loftness asserted that they consider the Nondisclosure Agreement and the May 2008 Agreement to be separate agreements dealing with different subject matter.

*Co. v. Bird Island Produce, Inc.*, 82 N.W.2d 48, 54 (Minn. 1957) (internal citations omitted). Courts should construe documents entered into by different parties relating to separate transactions or subject matter as unrelated. *See Dunahugh v. Env't Sys. Co.* 2 F.3d 817, 823 (8th Cir. 1993) (citing *Anchor Cas.*, 82 N.W.2d at 54).

In the Court's April 2012 Order, it concluded that "it is not clear that the parties intended that the SRA would supersede the Nondisclosure Agreement" and that the SRA and the Nondisclosure Agreement pertained to different subject matter. (April 2012 Order at 12.) Neither party has alleged any facts sufficient to disturb the Court's previous conclusion that the subject matter of the SRA and the Nondisclosure Agreement are distinct. Moreover, though both Loftness and T&A, Inc. were parties to both the Nondisclosure Agreement and the SRA, these contracts were signed over seven months apart.[8] As such, the Court concludes that the merger clause did not allow the SRA to replace the Nondisclosure Agreement or the May 2008 Agreement, and reads the contracts as separate. Thus, the Nondisclosure Agreement remains in effect.

## III.    Breach of the Nondisclosure Agreement

Loftness argues that even if the Nondisclosure Agreement remains in effect, Loftness has never breached the provision prohibiting the disclosure of Confidential Information. Moreover, Loftness contends that Defendants wanted Loftness to make their ideas public by developing and producing the grain storage equipment improvements Defendants suggested. Loftness further asserts that despite subsequent

---

[8]    The Court need not determine the effect of the differences in the named parties to the Nondisclosure Agreement, SRA, and May 2008 Agreement because this issue does not change the ultimate outcome of the Court's analysis.

months of discovery, including the depositions of all key parties, Defendants failed to meet their burden to show that any of the ideas they brought to Loftness did not become public when Loftness began manufacturing and selling the Grain Bag Storage Systems. Defendants argue that while some of their ideas may be publicly available now, the Nondisclosure Agreement prohibited Loftness from using any of the ideas they shared with Loftness to compete with Defendants for a period of twenty years.

In order to establish claims for misappropriation of confidential information and trade secrets, a plaintiff must show that: (1) the information is not generally known or ascertainable; (2) the information provides a demonstrable competitive advantage; and (3) the information was subject to reasonable efforts to maintain its secrecy. *Cherne Indus., Inc. v. Grounds & Assoc., Inc.,* 278 N.W.2d 81, 92–93 (Minn. 1979) (stating the standard for common law misappropriation of confidential information claims); *Strategic Directions Grp., Inc. v. Bristol-Meyers Squibb Co.,* 293 F.3d 1062, 1064–65 (8th Cir. 2002) (stating the standard for Minnesota UTSA claims). If a party suing to enforce a confidentiality agreement does not take adequate, reasonable steps to ensure the secrecy of the confidential information, the other party is not obligated to maintain its secrecy. *Compare Arizant Holdings, Inc. v. Gust*, 668 F. Supp. 2d 1194, 1205 n.5 (D. Minn. 2009) (denying injunction where defendant disclosed e-mails that plaintiff did not mark as "confidential") *with Breton S.P.A. v. Cambria Co.*, No. 05-2631, 2006 WL 314497, at *4 (D. Minn. Feb. 9, 2006) (finding plaintiff's steps to maintain confidentiality including "insisting that its licensees, employees, consultants, and suppliers agree not to disclose confidential information" were sufficient to show a "reasonable likelihood of success" in

showing adequate steps to protect secrecy).  After Confidential Information enters the public domain, its protection is not necessarily vitiated because "[i]n some cases, a novel or unique combination of elements may constitute a trade secret." *Strategic Directions Grp.,* 293 F.3d at 1065 (citing *Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 899 (Minn. 1993); *AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 972 (8th Cir. 2011) ("Compilations of non-secret and secret information can be valuable so long as the combination affords a competitive advantage and is not readily ascertainable.") (internal citation omitted).  Yet, once confidential information regarding product improvements or manufacturing processes has been incorporated into a patent or a marketed product, it is no longer confidential.  *See Modern Controls, Inc. v. Andreadakis*, 578 F.2d 1264, 1269 n.10  (8th Cir. 1978) (finding non-compete agreement enforceable, yet reasoning that "during the time of [defendant's] employment, the device moved from an unmarketable state to a marketable one," thus placing the subsequently patented production techniques into "the public domain.") (citing 35 U.S.C. § 112); *Neil and Spencer Holdings, Ltd. v. Kleen-Rite, Inc.*, 479 F. Supp. 164, 171 (E.D.M.O. 1979) ("[T]he Court finds that since [the confidential information] w[as] embodied in the [product] itself, or contained in the patent or operating manual, the plaintiff has not established their status as trade secrets.").

Despite Defendants' assertions that the specific product ideas and market information they shared with Loftness in May 2007 remained confidential after the products were developed, Defendants have failed to point to any facts demonstrating that they made any effort to keep these ideas confidential.  Moreover, Defendants entered into

the May 2008 Agreement anticipating that Loftness would develop their ideas into marketed products for the parties' mutual benefit. Defendants applied for a patent for the Grain Bag Storage System in April 2008, the patent application was published in October 2009, and the patent was issued in August 2011. The April 2010 agreement between Loftness and Brandt was entered into six months after the patent was published and several years after the Grain Bag Storage Systems were manufactured and sold. The Confidential Information Defendants brought to Loftness, therefore, ceased to be confidential pursuant to the Nondisclosure Agreement after the information was turned into marketed, patented products. Thus, reading the facts in a light most favorable to Defendants, Loftness's use of this information to compete against Defendants through the agreement with Brandt did not violate the Nondisclosure Agreement.

Defendants' reliance on *AvidAir* and *Cardiac Pacemakers, Inc. v. Aspen II Holding Co., Inc.*, 413 F. Supp. 2d 1016, 1024 (D. Minn. 2006) is misplaced because in both cases the trade secrets at issue were adequately protected. Though the Eighth Circuit in *AvidAir* held that information that can be ascertained through public sources may be confidential, it did not hold that confidential information that later becomes public remains confidential indefinitely. 663 F.3d at 972–73. Moreover, in *AvidAir*, the Eighth Circuit rested its holding on the finding that the defendant made "reasonable efforts to maintain secrecy" of the documents in question and that AvidAir failed to show that defendant distributed the documents to parties that were not bound by the confidentiality agreements. *Id.* at 974. Here, in contrast, the Defendants themselves shared the Grain Bag Storage System improvement ideas with third parties without

16

indicating that the information was confidential.  (Doc. No. 54, Berg. Aff. ¶ 2, Exs. 9, 10.)  Moreover, Defendants made no effort to amend their UTSA claim, which was dismissed for lack of specificity.  (April 2012 Order at 13–14.)

Defendants have failed to demonstrate any genuine issues of material fact that put the public nature of the purported Confidential Information in dispute.  The Grain Bag Storage System and improvement ideas they brought to Loftness were subsequently patented and turned into products that were sold with detailed owner's manuals.  Defendants also have made no showing that Loftness failed to return any materials containing Confidential Information.  Indisputably, Loftness implemented the ideas and marketing information that Defendants brought to them.  Further, Loftness entered into the agreement with Brandt six months after the patent was published and several years after the Grain Bag Storage System improvements were implemented in freely sold products.  Though the Nondisclosure Agreement remains in effect, the Court cannot find that any Confidential Information remains protected under the Nondisclosure Agreement, that Loftness improperly used any Confidential Information to compete with Defendants, or that any materials containing Confidential Information were not returned to Defendants.

## IV.     Breach of the May 2008 Agreement

Defendants allege that before the agreement's expiration in May 2010, Loftness orally extended the May 2008 Agreement, which required Loftness to make two percent override payments on the Grain Bag Storage Systems that were sold.  Specifically, Defendants assert that the May 2008 Agreement was orally extended via separate

telephone conversations wherein Loftness represented that it had made an agreement with Brandt to sell truck auger attachments in conjunction with Loftness manufactured grain bagging equipment and expressly confirmed it would continue to pay the two percent override for any grain storage equipment sold to Brandt, as well as for any grain storage system equipment sold through Loftness's distribution channels.  (Countercl. ¶¶ 35, 36.)  Defendants also allege that Loftness continued to pay the two percent override until March 1, 2011.  (*Id.* ¶ 34.)

Loftness argues that the May 2008 Agreement expired on May 21, 2010, and it was not obligated to continue making payments under the Agreement after that date.  Loftness further contends that it could terminate any alleged oral extension at will and that the statute of frauds renders any alleged oral modification to the May 2008 Agreement unenforceable.

Defendants' argument that the May 3, 2010 oral modification extended the term of the May 2008 Agreement is unavailing because such an amendment would violate the statute of frauds.  The Minnesota statute of frauds delineates that a contract "that by its terms is not to be performed within one year from the making thereof" is unenforceable unless "such agreement, or some note or memorandum thereof, expressing the consideration, is in writing, and subscribed by the party charged therewith."  Minn. Stat. § 513.01.  The statute of frauds expresses the public policy of preventing the enforcement of contracts by means of fraud and perjury that were never in fact made.  *See Radke v. Brenon*, 134 N.W.2d 887, 890 (Minn. 1965); *see also Worwa v. Solz Enter., Inc.*, 238 N.W.2d 628, 631 (Minn. 1976) (holding summary judgment on statute of frauds defense

appropriate because the two-year payment agreement "plainly cannot be performed within 1 year"). Accepting Defendants' factual allegations regarding the May 3, 2012 conversation as true and making all factual inferences in Defendants' favor, regardless of whether the term of the two percent payments were extended to twenty years or ten years, the alleged amendment would not satisfy the statute of frauds because it could not be performed within one year. Moreover, based on the facts asserted, and viewing the facts in a light most favorable to Defendants, there was no meeting of the minds sufficient to make the extension operable. Therefore, the purported oral modification has no effect.

Defendants' claim that Loftness breached the May 2008 Agreement by failing to continue the two percent payments beyond February 2011 is without merit. By its terms, the May 2008 Agreement was in effect for two years and could be terminated by Defendants with thirty days' notice. Loftness paid Defendants the two percent override fees they were owed from May 2008 and May 2010. The existence of an implied in fact contract for the payments Loftness made between June 2010 and February 2011 does not extend the May 2008 Agreement beyond February 2011 because implied in fact contracts are terminable at will by either party upon reasonable notice. *See Benson Co-op Creamery Ass'n v. First Dist. Ass'n*, 151 N.W.2d 422, 426 (Minn. 1967) ("The general rule is that a contract having no definite duration, expressed or which may be implied, is terminable by either party at will upon reasonable notice to the other.") (internal citation omitted); *see also Ag-Chem. Equip. Co. v. Hahn, Inc.*, 480 F.2d 482, 487 (8th Cir. 1973) (same). Regardless of Loftness's reason for continuing to pay the two percent override to Defendants for nine months beyond May 2010, Loftness's obligations under the May

2008 Agreement ended on May 21, 2010. Construing Loftness's continued payments as an implied in fact contract does not extend the May 2008 Agreement beyond February 2011 because Loftness gave thirty days' notice before discontinuing payments. Further, the duration of the May 2008 Agreement is unambiguous, and even if this term were, it would be construed against its drafters, Defendants. *See Hilligoss v. Cargill*, Inc., 649 N.W.2d 142, 148 (Minn. 2002) (holding ambiguous contract term construed against drafting party). The Court finds no genuine issue of material fact in dispute as to whether Loftness ever was or is in breach of the May 2008 Agreement or the Nondisclosure Agreement.

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that:

1. Loftness' Motion for Summary Judgment (Doc. No. [40]) is **GRANTED**;

2. Counts One and Two of Defendants' Counterclaim (Doc. No. [13]) are **DISMISSED WITH PREJUDICE**.

Dated: October 15, 2012                    s/Donovan W. Frank
                                            DONOVAN W. FRANK
                                            United States District Judge